# MARR JONES & WANG

### A LIMITED LIABILITY LAW PARTNERSHIP

*Labor and Employment Law*

March 8, 2019

*Via EEOC Respondent Portal*

Ms. Emily Mauga
U. S Equal Employment Opportunity Commission
Honolulu Local Office
300 Ala Moana Blvd., Room 4-257
Honolulu, Hawaii  96850

> **Re:**   **Gaurav Thakral, M.D. v. Hawaii Residency Programs, Inc. and University of Hawaii John A. Burns School of Medicine; EEOC Charge No. 486-2019-00103**

Dear Ms. Mauga:

This position statement is submitted in response to the above-referenced charge ("Charge") filed by Gaurav Thakral ("Complainant"). Complainant's Charge alleges that he had a disability (dyslexia) and was subjected to disability discrimination while he was in the University of Hawaii John A. Burns School of Medicine Pathology Residency Training Program. However, the Charge is without merit.

First, it is not clear that Complainant even had a disability. His psychologist, Dr. Karen Tyson, conducted testing showing that Complainant generally has high cognitive abilities and that his reading scores were at least average. Therefore, her opinion that his reading skills lagged was only in light of his high intellect; she otherwise noted that his reading was "adequate," "comparable with other individuals his age," and "within the average range." Adequate and average reading ability is not a substantial limitation.

Second, even assuming that Complainant had a disability, he was still not a qualified individual. As a pathology resident, Complainant was required to perform patient care in a safe and effective manner, demonstrate appropriate academic achievement in six designated Competencies (including Patient Care), and function with increasing independence and decreasing supervision. During his residency, Complainant was not able to perform these functions and had ongoing deficiencies, including as to insufficient knowledge and clinical errors/incorrect diagnoses. He was placed on a series of remediation programs (which afforded him close supervision and customized guidance) – Targeted Mentorship, Academic Notice, and Academic Warning – yet he still did not improve. He was then given Notice of Prospective Dismissal. It was only after receiving the Notice of Prospective Dismissal that Complainant

Pauahi Tower • 1003 Bishop Street, Suite 1500 • Honolulu, Hawaii 96813
Phone: (808) 536-4900 • Fax: (808) 536-6700 • Direct: (808) 566-5630 • E-mail: cyeh@marrjones.com

EXHIBIT "4"

Ms. Emily Mauga
March 8, 2019
Page 2

indicated that he had dyslexia and wanted accommodations.  Although it was not clear that Complainant had a disability, the Program nevertheless considered accommodations.  However, accommodations that were needed were not reasonable.  For instance, Dr. Tyson confirmed that Complainant was prone to making numerical reversals and errors, which is a major concern for pathology – a medical specialty requiring close and accurate work with numerical sequences. Dr. Tyson confirmed that Complainant needed to have, among other things, (a) faculty regularly double-checking his work (*e.g.*, his measurements, notations, and diagnoses) to catch errors, and (b) either a text-to-voice computer application or the ongoing accompaniment of a human reader to read aloud information.  However, neither accommodation (much less both) was reasonable: Regularly double-checking work would require faculty to accompany Complainant throughout his daily duties and repeat/review his measurements and other actions, which faculty do not have time to do; it would also duplicate, and therefore excuse Complainant from, essential functions. The text-to-voice application would not be able to read charts and data tables that pathologists routinely work with (which Dr. Tyson later admitted), and a human reader would be excessively costly and raise medical privacy and insurability issues.  Given that Complainant could not be qualified through reasonable accommodations, the Program affirmed its dismissal decision.

Third, the Program had an alternative legitimate basis for dismissing Complainant:  At the first medical school he attended, Complainant had been unable to pass his pathology coursework in three attempts, and then was ultimately dismissed.  Complainant did not disclose this in his residency program application (he gave a different and innocuous reason for leaving his first medical school), and this medical school dismissal came to light only when Dr. Tyson happened to disclose it.  Had Complainant initially disclosed this medical school deficiency, he would not have been accepted to the Program, and this deficiency provided an alternative basis for dismissal.

I.      **BACKGROUND FACTS**

A.      **General Background on Respondents**

The University of Hawaii (UH) is a state university which, among other things, operates the John A. Burns School of Medicine (JABSOM).  JABSOM includes a medical school as well as post-medical school residency training programs in fields such as Internal Medicine, Pediatrics, Pathology, Surgery, and others.  Each JABSOM residency program has its own Program Director with authority and accountability for the operation of his/her respective program.[1]

---

[1]      This role of the Program Director as the singular authority is required by the rules of the Accreditation Council of Graduate Medical Education (ACGME).  The ACGME is a non-profit body responsible for the accreditation of post-MD medical training programs in the United States.

Ms. Emily Mauga
March 8, 2019
Page 3

Hawaii Residency Programs, Inc. (HRP) is a non-profit corporation that employs the medical residents enrolled in JABSOM. HRP enters into a contract entitled "Agreement for Appointment to Residency Training" with each resident, administers residents' compensation and benefits, and provides other administrative services. It is HRP, not JABSOM, that employs the medical residents.

An academic year for a JABSOM/HRP medical resident typically runs from July 1 through the following June 30. A resident's level of experience in his/her particular field is denominated as a "PGY" (Program Year); for instance, a 1st year resident is referred to as a PGY-1 resident, a 2nd year resident is referred to as a PGY-2 resident, and so forth. Generally, each resident is enrolled and contracted on a one-year basis and must demonstrate development as he/she advances through the year, and there is no guarantee of advancing to the next year. Rather, the JABSOM Program makes an academic assessment as to whether the resident has demonstrated sufficient development and competence to progress to the next academic level and to be enrolled for the following academic year.

### B.   Anti-Discrimination Policies

In its Resident Handbook ("Handbook"), HRP maintains its commitment to non-discrimination and equal employment opportunity:

> HRP selects qualified Residents in a manner which does not discriminate because of race, color, religion, sex, including gender identity or expression, age, national origin, ancestry, citizenship, marital status, domestic or sexual violence victim status, veteran status, military status, arrest and court record, disability, sexual orientation, genetic information or any other status protected under state or federal equal opportunity laws or regulations. We prohibit any form of discrimination or harassment on the basis of race, color, religion, sex, age, national origin, ancestry, citizenship, marital status, veteran status, military status, arrest and court record, disability, sexual orientation, genetic information, or any other protected characteristic.

The Handbook also contains a policy entitled "Individuals with Disabilities or Illnesses" which states in part:

> HRP and the programs will make every effort to reasonably accommodate an employee with a disability. A resident is encouraged to contact the Program Administrator or HRP Human Resources Manager when information indicates that a resident has or may have a disability which requires a reasonable accommodation and/or presents a direct threat to the health and safety of the resident or others.

Ms. Emily Mauga
March 8, 2019
Page 4

Reasonable accommodation means modifications or adjustments to the work environment and/or manner in which work is done so as to enable the resident to perform the essential functions of his/her job and training program without undue hardship to HRP or alteration of academic standards.

\*       \*       \*

HRP prohibits discrimination against or harassment of qualified individuals with disabilities. Any employee who believes he/she has been subjected to discrimination or harassment on the basis of disability should immediately raise the issue with the Program Administrator, the HRP Chief Executive Officer, the HRP Chief Operating Officer, or the HRP Human Resources Manager. Retaliation against any employee for raising such a good faith complaint is strictly prohibited.

C.      **Standards of Conduct**

As noted above, each Resident signs a Resident Agreement. The Resident Agreement identifies numerous resident responsibilities, including but not limited to the following:

(a)     Patient Care. The Resident shall render services to patients in a safe, diligent, and effective manner, and in compliance with all applicable policies, directives, practices, and procedures as prescribed by the Sponsoring Institution, the Program, the assigned Hospital, the ACGME, and/or applicable law.

(b)     Compliance with HRP and Program Expectations. The Resident shall comply with all policies, directives, practices, and procedures of HRP and the Program, including, but not limited to, all policies, directives, practices, and procedures set forth in the Program and HRP Resident Handbooks.

\*   \*   \*

(e)     Compliance with ACGME Requirements: The Resident shall comply with all standards and requirements of the ACGME, including but not limited to, Duty Hours requirements and limitations, and standards and requirements concerning the progress toward, achievement of, and/or maintenance of the ACGME "Core Competencies" as may be appropriate for the Resident's level of experience and training.

Ms. Emily Mauga
March 8, 2019
Page 5

The Resident Agreement also provides for sanctions – including, but not limited to, non-appointment to a subsequent agreement, non-award of academic credit, and permanent dismissal – in the event of the resident's dificient performance or conduct.  A non-exhaustive list of such performance or conduct includes, among other things:

> (a) failure, refusal or inability to perform duties as required by this Agreement, or otherwise failing to satisfy any of the Resident Responsibilities as identified in the Agreement;
>
> (b) violation of any term or condition of this Agreement;
>
> (c) academic deficiencies (including, but not limited to, failure to progress toward, achieve and/or maintain ACGME "Core Competencies"), poor performance (including poor clinical judgment and/or performance), negligence, incompetence, or unprofessional conduct, as determined by the Program or HRP[.]

The Resident Agreement (Section 12, "Academic Discretion") further makes clear that such sanctions involve an exercise of academic discretion by the Program:

> As identified in this Agreement, JABSOM's Program Director will make numerous determinations concerning the Resident, including with regard to sanctions (suspension, dismissal or otherwise), appointment to the next level of residency, and awarding credit.  The Resident understands and agrees that such determinations are academic in nature, based upon an evaluation and assessment of the Resident's academic performance (including clinical performance and judgment) in light of the ACGME Core Competencies and JABSOM's authority and responsibility as ACGME Sponsoring Insitution.  Such determinations are within the sole discretion of the JABSOM Program Director, and shall be treated as academic decisions involving the exercise of academic discretion.

The Handbook contains a section entitled, "Code of Conduct and Sanctions" which has language that is materially identical to the discussion of sanctions in the Resident Agreement.

**D.      Pathology Program**

The JABSOM Pathology Residency Training Program ("Program" or "Pathology Program") is a four-year program that educates its residents in clinical pathology (study of bodily fluids) and anatomic pathology (study of organs and tissues) for the purpose of diagnosing

Ms. Emily Mauga
March 8, 2019
Page 6

diseases. In each academic year, a resident has a series of "rotations" in different pathology sub-areas. In each rotation, the resident trains under the supervision and evaluation of Attending Physicians who have UH faculty appointments, typically on a volunteer and non-compensated basis.

The Program Director for the Pathology Program is Amy Powers, M.D. In such position, Dr. Powers, among other things, oversees the Program's curriculum and quality of education, interacts with Program faculty, interacts with and oversees residents in the Program, and makes academic decisions about residents including as to their cumulative evaluation, promotion, and discipline. These academic decisions are based upon Dr. Powers' expertise and experience as an academician and Pathologist, her review of each resident's rotation evaluations by faculty, her own direct interactions with the residents, and the recommendations and input from the Program's Clinical Competency Committee – a committee of Program faculty members who review residents' performance (hereinafter "CCC").

It is essential for a Pathology resident to, among other things, perform patient-related duties in a safe and effective manner, demonstrate appropriate academic achievement in each of the six ACGME core competencies (i.e., Patient Care,[2] Medical Knowledge, Practice-Based Learning and Improvement, Interpersonal and Communication Skills, Professionalism, and Systems-Based Practice), and – in order to advance to the next academic year – function with greater independence and decreasing levels of supervision.

For a PGY-2 resident, this means handling virtually all activities without "Direct Supervision" (i.e., without a faculty member physically present) and instead with only "Indirect A Supervision" (i.e., faculty not physically present but within the hospital) for certain activities and "Indirect B supervision" (i.e., faculty neither physically present with resident nor within hospital) for other activities.

By the PGY-3 year, the resident must operate with even greater independence, which for certain functions means only "Oversight" (i.e., the faculty member is only available to provide review after the resident has delivered care), and also must supervise junior residents.

---

[2]      For Pathology, the Patient Care competency includes: (1) Attain competence in anatomic pathology diagnostic skills including surgical pathology, cytopathology, medical and forensic autopsy pathology, etc. (2) Attain competence in anatomic pathology procedural skills including grossing, intraoperative consultation, fine needle aspiration and core needle biopsy, medical and forensic autopsies, etc. (3) Utilize relevant clinical and pathologic information in constructing accurate, concise, complete, and clinically useful pathology reports in a timely manner and act as an expert consultant in anatomic pathology. (4) Provide expert consultation on the interpretation and follow-up of clinical laboratory test results. (5) Utilize relevant clinical and laboratory information in acting as an expert consultant in laboratory medicine, including efficient utilization of the laboratory in diagnosis and patient management.

Ms. Emily Mauga
March 8, 2019
Page 7

This means that, in the latter part of his/her PGY-2 year, a resident must be approaching readiness for such independent practice and supervision of others.

Pathologists play a critical role in patient safety and patient treatment. For instance, it is the pathologist's analysis and interpretation of the patient's body fluid, organ, or tissue that can dictate whether a patient needs certain treatment and, if so, what type of treatment. In this regard, reading, notating, and transcribing measurements/numbers are an essential and fundamental part of the Pathology resident's duties, and it is critical that this be done accurately. For Clinical Pathology, examples include the following:

- On this form, the lab notates data relating to testing for a lupus anticoagulant. (A lupus anticoagulant is an antibody which may cause a blood clot in a patient.) The resident must confirm that this data has been notated correctly from a prior form, read and interpret this data to reach an opinion on whether the patient meets the diagnostic criteria for a lupus anticoagulant, and write down the resident's diagnosis in the right-hand column.

- On this form, the lab notates data relating to a patient's blood coagulation. The resident must confirm that this data has been notated correctly from a prior form, read and interpret this data, and make an interpretation at the bottom of the form (*e.g.*, "T1 + M5A + M5B + M5C + M5D + M8A") as to whether the patient may have any deficiency or inhibitor.

- On this form is a list of reagent red blood cells (*e.g.*, "RzR1 A4194") and each reagent red blood cell antigen typing. Each reagent gets mixed with the patient's blood to test for a reaction to see if the patient's blood contains any red blood cell antibodies. The lab notates the patient's test results with each reagent with a score of 0 to 4. The resident must then interpret those test results and data patterns (which requires reading the reagent antigen typing and patient reactions correctly) and interpret the data to determine which antibody(s) specificity the patient has and which blood from the stockpile can be safely transfused to the patient. Transfusion of the wrong blood may be a fatal event.

In the above examples, misreading or erroneously notating any of the numbers could result in an incorrect diagnosis, which in turn could have a drastic impact on the patient's treatment and well-being.

For Anatomic Pathology, one very common scenario involves the gross examination, followed by final diagnosis, of tissue. The involved steps include:

- A tissue specimen is delivered to the pathology department, accessioned, and assigned a unique pathology number (*e.g.*, 51234).

Ms. Emily Mauga
March 8, 2019
Page 8

- At the gross examination stage, the resident analyzes the tissue for tumors and lesions, takes and records measurements of the tumor or lesion (*e.g.*, weight, dimensions, findings), and cuts the tumor or lesion into smaller samples that are put into cassettes and eventually transformed into microscopic slides.          Each slide is labeled with the unique accession number.

- At the final diagnosis stage, the resident analyzes the slide(s), logs into the pathology laboratory information system on a computer, types in the accession number, and inputs the pathology diagnosis into the "Final Diagnosis" template for that accession number.

Should the resident/pathologist make any reversal (transposition error) or other error in this process, it could have drastic negative consequences.  For instance:

- A reversal on a gross tumor evaluation – such as a 2.4 cm tumor notated as a 4.2 cm tumor, or a 1.2 cm tumor notated as 2.1 cm tumor – could potentially cause inappropriate changes in staging and/or therapy.

- If an accession number is mis-transposed (e.g., 51243 instead of 51234), a diagnosis for one patient may be given to a different patient.

- A reversal of lab results – such as a hemoglobin of 5.8 (low, necessitating transfusion) communicated as 8.5 (low, but above the standard transfusion threshold), or a 6.5 potassium level (high, a "critical" value) being communicated as 5.6 (high, but not a "critical" value) – could result in clinicians relying upon incorrect data and providing improper and even harmful treatment.

### E.  <u>Complainant's Background Prior to his Hawaii Residency</u>

Between 2002 and 2005, Complainant attended the American University of the Caribbean School of Medicine ("AUC Medical School").  During the course of this training, Complainant was unable to pass his Pathology coursework in three consecutive attempts:

- In the January 2004 Semester, he had an Incomplete.
- In the May 2004 Semester, he had a Withdrawal.
- In the September 2004 semester, he had a Fail.

In January 2005, Complainant was <u>dismissed</u> from the AUC Medical School. ("Exit Reason" is "Dismissed," and "Final Academic Standing" is "AD" a.k.a. academic dismissal).

Ms. Emily Mauga
March 8, 2019
Page 9

From 2005 through 2008, Complainant attended St. Matthew's University School of Medicine ("St. Matthew's Medical School").

Between 2008 and 2014, after graduating from St. Matthew's Medical School, Complainant apparently performed a variety of medical research work.

In the Fall of 2014, Complainant submitted an application for residency training through the Electronic Residency Application Services (ERAS), which is a centralized online service for applying to residency programs.

In his application, Complainant was asked to identify his medical education, and in response he identified AUC Medical School and St. Matthew's Medical School. The ERAS form also specifically asked "Medical Education/Training Extended or Interrupted?" In response, Complainant wrote "Yes" and gave an explanation in which he completely omitted the critical fact that he had been dismissed from AUC and instead gave a different reason (*i.e.,* he wanted to pursue a dual degree program) for his "transfer" from AUC:

> Explanation: During my father's hospitalization, I took a semester off. Realizing the importance of business administration and medicine, I sought out a dual degree program that included a health care administrative degree. My medical education was interrupted during this transfer.

Therefore, when the JABSOM Pathology Program received and reviewed Complainant's ERAS application, it had no reason to know that Complainant had been dismissed from AUC Medical School or had been unable to complete his Pathology coursework in three attempts. Had JABSOM known this, it would not have accepted Complainant.[3] Instead, the Program accepted Complainant.

**F.   Complainant's Hawaii Residency**

    **1.   Complainant's Performance Issues**

From July 2015 through June 2016, Complainant served as a PGY-1 in the Pathology Program.

---

[3]   More recently, Complainant has alleged that he verbally disclosed his AUC dismissal to the Program during recruiting interviews. However, this allegation is inaccurate. It is also inconsistent with Complainant's written ERAS response in which he substituted the dismissal with a different reason for leaving AUC.

Ms. Emily Mauga
March 8, 2019
Page 10

In reviewing Complainant's performance in his PGY-1 year, the Program's Clinical Competency Committee found that Complainant had material deficiencies including as to medical knowledge and his result on the nationally standardized Resident In-Service Examination result (15%).

From July 2016 through June 2017, Complainant served as a PGY-2 in the Pathology Program.[4]  For the first three months of his PGY-2 year (from July 1 through September 30, 2016), because of the above-noted deficiencies, Complainant was placed on a **Targeted Mentorship** designed to help him with designated faculty mentors and additional support in expanding his pathology skills and knowledge base.

In the Fall of 2016, the Clinical Competency Committee found that Complainant's performance (including medical knowledge and retention) continued to be substandard, despite the Targeted Mentorship.

Accordingly, on November 1, 2016, Complainant was placed on **Academic Notice** with remediation beginning November 1, 2016 and continuing through January 31, 2017.  The Academic Notice indicated, among other things, that failure to fulfill requirements may result in further action including dismissal.

From November 2016 through January 2017, Complainant received remediation including enhanced feedback and training – for instance, regular meetings with two designated faculty to review slides and topics and to discuss study materials and reading lists, and the opportunity to meet with a third faculty member to review slides.

Starting in January 2017, with ongoing remediation, Complainant had a two-month Transfusion Medicine (Blood Bank) rotation.  During this rotation, Complainant still had serious problems, including having challenges answering clinical calls, providing incorrect advice to a clinician that could have jeopardized patient care and that required the attending's immediate interventions, coming to incorrect conclusions about blood requirements for surgery even after researching the topic, being unable to consistently provide correct coagulation testing interpretations even after repeated teaching and discussions, and giving a coagulation presentation that was too basic and not at the level of a pathology resident.

On February 2, 2017, again with the full support of the Clinical Competency Committee, the Program issued an **Academic Warning**, with an extension of remediation through February 28, 2017.  The Academic Warning indicated, among other things, that failure to fulfill requirements may result in further action including dismissal.  The extended remediation set forth certain performance goals and provided that faculty members (Dr. Powers and Dr. Ortega-Lopez) would meet with Complainant daily with regard to completing the required service work,

---

4

Ms. Emily Mauga
March 8, 2019
Page 11


reviewing clinical calls, giving didactics, and recommending study and reading materials.

On February 16, 2017, Dr. Powers and Dr. Ortega-Lopez formally met with Complainant to discuss his ongoing deficiencies, including making incorrect diagnoses.

Despite the Program's feedback and remediation, Complainant still did not demonstrate the necessary skills and knowledge,[5] was not able to progress beyond direct supervision,[6] performed poorly on the final assessment,[7] and did not pass the Transfusion Medicine rotation.

### 2. March-November 2017:  Complainant Receives Notice of Prospective Dismissal and Thereafter Requests Accommodation

On March 3, 2017, the CCC met and carefully considered the Program's extensive remediation efforts and Complainant's prior and ongoing deficiencies (such as marginal performance in cytopathology with deficits in medical knowledge and knowledge retention, failure to pass the Transfusion Medicine rotation, and the impact of the deficiencies on patient safety).  In that meeting, the CCC members voted unanimously against further remediation attempts and instead to discontinue Complainant's training, and Dr. Powers accepted the recommendation.

Also in early March 2017, Complainant had a two-week surgical pathology rotation in which he continued to demonstrate problems.  This included multiple diagnostic errors on draft reports, such as misidentifying normal endocervical glands as cancerous (endocervical carcinoma) and misdiagnosing a colonic tubular adenoma as chronic gastritis (misdiagnosing both the organ site and a neoplastic condition as inflammatory).  He also did not complete preliminary drafts of surgical pathology reports before leaving work, as is expected of a PGY-2 pathology resident.

---

[5]      For instance, Complainant still had difficulties in making correct diagnoses and interpretations (such as interpreting coagulation and blood bank testing and consultations which are routine duties in the blood bank).

[6]      Residents typically come off direct supervision within a few weeks or less, but Complainant could not be entrusted to do so.  In one instance, Complainant had a consult call with a clinician in which he had not properly researched the information and had not consulted with the attending, and he gave incorrect advice regarding interpretation of a test.

[7]      This final assessment included clinical scenarios and concepts that were taught and/or encountered during the rotation, yet approximately 50% of the questions were answered incorrectly.

Ms. Emily Mauga
March 8, 2019
Page 12

On March 17, 2017, Dr. Powers (and other personnel) met with Plaintiff, and he was issued a **Notice of Prospective Dismissal** ("Prospective Dismissal Notice"). [8] This Prospective Dismissal Notice explained the dissatisfaction with Plaintiff's performance:

> Ultimately, despite the Program's feedback and remediation, you did not demonstrate the necessary skills and knowledge, were not able to progress beyond direct supervision, performed poorly on the final assessment, and did not pass the Transfusion Medicine [*i.e.,* Blood Bank] rotation.

*See id.* At the time she had made the decision to prospectively dismiss Complainant and up through this date, Dr. Powers was <u>not</u> aware that he had dyslexia or that he was seeking to attribute any performance deficiencies to dyslexia. At this March 17, 2017 meeting, only <u>after</u> being given the Notice, Complainant first disclosed that he had dyslexia.

On or around March 31, 2017, after the Notice of Prospective Dismissal, Plaintiff submitted a grievance in which he referred to dyslexia and for the first time asked for medical accommodations.

However, Dr. Tyson's testing found that, <u>when compared to the average person</u>, Complainant performed at average, above average, or superior levels in every metric.

- For General Cognitive Functioning, Complainant's scores on the Wechsler Adult Intelligence Scale were as follows:

| | |
|---|---|
| Verbal Comprehension | High Average (better than 82% of peers) |
| Perceptual Reasoning | Very Superior ((better than 99.6% of peers) |
| Working Memory | Average (better than 70% of peers) |
| Processing Speed | High Average (better than 91% of peers) |
| Full Scale IQ | Superior (better than 90% of peers) |
| General Ability Index | Very Superior (better than 98% of peers) |

- For Academic Achievement (reading), Complainant's scores on the Nelson-Denny Reading Test were as follows:

| | |
|---|---|
| Vocabulary | Average |
| Comprehension | Average |
| Reading Rate | Average |
| Total Reading | Average |

---

[8] The Program administration never told Complainant to get tested.

Ms. Emily Mauga
March 8, 2019
Page 13

> Dr. Tyson commented: "This pattern [of scores] suggests that Gaurav's comprehension of the material he has read is <u>adequate</u>, comparable to his mechanics of reading. His reading rate indicates that he reads at a pace <u>comparable with other individuals his age.</u>"

- For Attention, Complainant's scores on the Test of Everyday Attention were all Average or High Average. Dr. Tyson noted that Complainant had "stronger than average levels of ability to selectively attend to stimuli, but otherwise average attentional capabilities for his normative age group."

- For Memory, Complainant's scores on the Wechsler Memory Scale were as follows:

| | |
|---|---|
| Auditory Working Memory | High Average (79%) |
| Visual Memory | High Average (84%) |
| Visual Working Memory | Superior (87%) |
| Immediate Memory | High Average (90%) |
| Delayed Memory | High Average (79%) |

> Dr. Tyson commented: "Overall, the results of the WMS-IV suggest Gaurav's visual memory is intact. His immediate and delayed memory function is also intact. He had above average ability to remember verbal information that was highly contextual. He also had above average ability remembering visual patterns that change or have varied rules. No concerns with memory abilities were identified."

- For Language, Complainant's scores on the Delis-Kaplan Executive Function System were Average, High Average, and Very Superior. Dr. Tyson commented: "Overall, it appears that Gaurav has adequate abilities with executive functions that require him to shift his attention quickly, be cognitively flexible, processes multiple stimuli and the same time, inhibit verbal responses, and sequence information. No serious concerns emerged."

Although Dr. Tyson also stated that Complainant might have a reading-based disability, this was only because he lagged <u>when compared to an elite group of high-IQ individuals such as himself.</u> ("Although these scores fall within the average range, Gaurav is not average; his scores if commensurate should fall within the 90[th] percentile. This discrepancy between his reading ability and his cognitive abilities suggest a pattern of dyslexia"); ("He was given the Nelson Denny Reading test and his scores all fell within the average range. While this does not seem to be concerning these scores are relative weaknesses for someone with such a high IQ").

Ms. Emily Mauga
March 8, 2019
Page 14

Dr. Tyson then provided numerous "Recommendations," most of which related to Complainant's own lifestyle choices and not modifications regarding the Program.[9] The only recommendation relating to the Program was additional time for examinations (which the Program agreed to, as discussed below).[10]

On April 24, 2017, the Program sent Complainant a letter, asking for more information as to Complainant's condition and potential accommodations.

On May 31, 2017, Dr. Tyson provided an amended report.                  The amended report noted Complainant's failure of medical school, which is the first time this had been disclosed to the Program: "Gaurav graduated from college with a Medical Degree from St. Matthew School of Medicine. He noted average performance in college, with significant difficulties in medical school – resulting in a transfer after failing."

The amended report also referred to Complainant having a reading impairment but again stated that this was because his reading lagged when compared to individuals with high cognitive levels: "Results of the WJ-IV indicate average reading and written expression, a significant weakness in comparison to his cognitive abilities. . . . He was also given the Nelson Denny Reading test and his scores all fell within the Average range." The amended report also made numerous recommendations that Dr. Tyson materially reiterated in her June 1, 2017 memorandum (described below).

On June 1, 2017, Dr. Tyson prepared a memorandum in response to the Program's April 24, 2017 letter.                  In this response, Dr. Tyson reiterated that Complainant had reading challenges but only in light of his high cognitive level: "[Complainant] reads slower and comprehends less of what he reads compared to other adults with the same cognitive capabilities."

Noting Complainant's susceptibility to inaccuracies and reversals, Dr. Tyson identified the following accommodations: (a) additional time on examinations; (b) having information read to Complainant either by a qualified reader or by a reading software program; (c) having his work reviewed by others "in order to confirm accuracy"; (d) having faculty members "double check his work for reversals and accuracy"; (e) individualized supervision; (f) 1-on-1 teaching sessions; (g) written and verbal feedback so as long as it is "not intended to highlight his errors"; and (h) audio recording of lectures and other educational experiences.                  The response also suggested that Complainant should be allowed to focus on the Anatomical

---

[9]      This included psychotherapy meetings, exercise, sleep, mindfulness, and having an organized routine with To-Do lists.

[10]      However, in Plaintiff's prior Transfusion Medicine exam (which he failed), he was given the standard full hour (allotted for all the test-takers) but chose to finish in 30 minutes, even after Dr. Ortega-Lopez advised him to take the full amount of time.

Ms. Emily Mauga
March 8, 2019
Page 15


Pathology portion of the Program and avoid the Clinical Pathology portion of the Program.

After receiving this response, the Program carefully considered each of the requested accommodations. On July 14, 2017, the Program sent a detailed letter to Complainant , providing the following comments on the accommodation requests.

- Additional time for exams: The Program would provide this, as long as Complainant consented to the Program disclosing his medical condition to the faculty members who were administering the exams.

- Qualified readers: Complainant could record himself reading aloud exam questions and then replay the recording to himself.

- Faculty mentorship; individualized supervision; 1-on-1 teaching: The Program in fact had been providing supervision and mentorship not only as part of Complainant's normal academic training but also in his customized Targeted Mentorship (July through September 2016), remediation (November 2016 through January 2017) and his revised remediation (February through March 2017).

  However, there is a limit on the extra supervision and training that the Program could reasonably provide. In order for Complainant's work to be double-checked for accuracy (as Dr. Tyson had identified), faculty would have to regularly repeat Complainant's measurements and other actions, which they would not have the time and resources to do on a regular basis. In addition, the double-checking would essentially duplicate Complainant's duties and excuse him from the essential functions of his position. Furthermore, Complainant's PGY-2 year could not be extended indefinitely under such an arrangement.

  The Program would further consider this matter but needed additional information as to Complainant's need for enhanced mentorship and supervision (further discussed below).

- Feedback: The Program would continue to provide feedback in a professional and constructive manner, but constructive feedback must necessarily point out errors and, when the errors are serious, emphasize the gravity of the errors in patient safety.

---

[11]   This included 1-on-1 meetings, as well as the opportunity to seek such further meetings, with attending faculty on each rotation, and with other faculty members specifically designated to assist and meet with Complainant – *e.g.,* Dr. Shimizu and Dr. Kim (faculty mentors during the Targeted Mentorship), Dr. Killen and Dr. Kitayama (to review slides and topics, recommend study materials, and provide reading lists), Dr. Sae-Ow (to review slides), and Dr. Powers and Dr. Ortega-Lopez (to have daily discussions regarding service work, clinical calls, didactics, and study and reading materials).

Ms. Emily Mauga
March 8, 2019
Page 16

- Recording of educational activities:  Such recording was problematic for several reasons.  For instance, any recording of protected health information (PHI) implicated regulatory requirements (HIPAA) and hospital policy (prohibiting recording PHI without the patient's consent) and increased the risk of PHI being taken off-premises and then misplaced or stolen.

- Anatomic Pathology:  The Program is structured and accredited to offer a combined Anatomic Pathology/Clinical Pathology curriculum that requires, at the very least, 18 months of AP and 18 months of CP.  The Program does not have the resources and is not accredited to offer an AP-only residency training program.

The Program also raised safety-related questions for Complainant to have Dr. Tyson address, including (a) since Complainant had to aurally process exam questions, was aural processing also necessary for Complainant to handle information in other documents (*e.g.*, patient charts, pathology and laboratory reports, *etc.*) in order to safely perform his regular ongoing duties ; (b) could Complainant safely function without having his work directly supervised or double-checked and (c) how long would Complainant need enhanced mentorship and supervision, and how likely was he to progress to the PGY-3 level which involves practicing under only indirect supervision and supervising junior residents  The Program also asked for a meeting with Dr. Tyson, which Complainant could attend.

Separately, on July 17, 2017, Dr. Powers sent Plaintiff a letter asking for more information about his apparent AUC dismissal, his official AUC transcript, and the AUC summative evaluation document regarding his performance.  (Despite multiple requests from the Program, Complainant never did provide his summative evaluation document.)

On August 5, 2017, Dr. Tyson sent a letter to Dr. Powers.  As to Complainant's ability to perform without aural processing of information, Dr. Tyson commented that, in non-exam situations, Complainant had a reduced chance of error; however, Dr. Tyson did not state that he would actually be safe in such situations.  As to how long Complainant would need enhanced mentorship and supervision and the likelihood of advancing to PGY-3, Dr. Tyson stated that Complainant was attentive to resources that could help him; however, she did not identify whether – or how long until – he could advance to a PGY-3 level.

The Program thereafter reiterated its interest in meeting with Dr. Tyson, and after coordinating schedules and availability, a meeting was scheduled for September 20, 2017.

On September 20, 2017, Dr. Powers and Program Administrator Noreen Matsuda met with Dr. Tyson.[12]  At this meeting, Dr. Powers explained the essential functions and rigors of Pathology residency, including the necessity for the resident to function with increasing independence and decreasing supervision. Dr. Tyson stated that she usually works with children, adolescents, and young adults for whom audio books and audio-related technology are generally

---

[12]     As noted above, Complainant was invited to attend, but he chose not to.

Ms. Emily Mauga
March 8, 2019
Page 17

available and sufficient, and she acknowledged that it was unusual for her to try to evaluate a patient who was involved in pathology work and who himself was a physician. Dr. Tyson then confirmed that, in the interest of patient safety:

- Complainant <u>did</u> require that his work be double-checked for reversals/errors. She could not estimate when he would progress to the point when the double-checking would become unnecessary.

- In performing his ongoing residency duties (*e.g.*, reviewing medical records), Complainant <u>did</u> need to have either a human reader or text-to-voice technology.

Because pathology residents are required to read reports that include not only text but also numbers, Dr. Powers showed Dr. Tyson examples of blood bank paperwork containing numbers and tables that residents have to interpret. Dr. Tyson confirmed that text-to-voice technology would <u>not</u> be effective for this pathology paperwork.

In October 2017, the Program received the AUC sealed transcript which (as noted above) confirmed not only that Plaintiff had been "dismissed" from AUC but also that he had been unable to pass his Pathology course despite three attempts.

On October 27, 2017, Respondents' counsel (Christopher Yeh) and Complainant's counsel (Robert Klein and Kurt Klein) met to discuss the requested accommodations and the challenges the Program faced in implementing them. They also discussed the Program's concerns about Complainant's omission of the AUC dismissal from his ERAS application.

On November 21, 2017, the Program sent a letter to Complainant, stating (a) the Program was not changing its March 17, 2017 prospective dismissal decision, given that the subsequently disclosed medical information did not necessitate revoking the decision, and (b) Complainant's AUC dismissal and failure of Pathology coursework provided an alternative and independent basis for dismissal.              . The letter indicated that Complainant could still proceed with his grievance on the March 17, 2017 prospective dismissal (*i.e.*, dismissal based upon performance issues) and could also file a grievance on the November 21 prospective dismissal (*i.e.*, dismissal based upon his poor AUC Medical School record).

More specifically, regarding the prospective dismissal for performance: The letter noted that Complainant had significant performance issues; that it was only at the March 17, 2017 dismissal notice meeting that Complainant first disclosed dyslexia; that Complainant's dyslexia made him prone to inaccuracies and reversals in his work; that "the Program does not find or state that your condition constitutes a disability but nevertheless has proceeded with considering potential accommodations"; and that the proposed accommodations were not reasonable and/or posed an undue hardship.          As to particular accommodations, the letter stated:

Ms. Emily Mauga
March 8, 2019
Page 18

Double-checking work: Dr. Tyson has indicated that you should have your work double-checked and reviewed for errors, including reversals of numbers. Now that the Program is aware that you have dyslexia and that it makes you prone to inaccuracies and reversals, such double-checking would be necessary on a regular and ongoing basis from a patient safety standpoint – *i.e.,* sporadic spot-checking would not safeguard patient safety.

However, in order for this double-checking to occur, faculty would have to regularly repeat/review your measurements and other actions, which the Program and faculty do not have the time and resources to do, much less on a regular basis.[13] Direct supervision would be required for all conversations with clinicians or patients to ensure numbers and data were accurately interpreted and communicated. In addition, such double-checking would essentially duplicate your duties and impermissibly excuse you from the position's essential functions, including performing many procedures under only indirect supervision (*i.e.,* without a faculty member present). Furthermore, while this double-checking would be unreasonable for any amount of time, here there is no anticipated temporal limit on this double-checking, and this open-ended duration of the double-checking would further exacerbate the hardship.

Text-to-voice technology and/or human reader
Dr. Tyson has indicated that you would also need text-to-voice technology (or alternatively a human reader) in order to process printed information on exams and medical records.

Setting aside whether such accommodation could be provided for exams, it cannot be reasonably provided for medical records. Medical records are a significant portion of what the Pathology resident needs to review and work with on a day-to-day basis, and they often include significant quantities of numbers in table and chart form. As Dr. Tyson acknowledged in her September 20, 2017 meeting with me, text-to-voice technology would not be effective in relaying these tables and charts.[14] A human reader would also not be appropriate: The Program is not financially able to employ a person to accompany you throughout your work in order to read such medical records.[15] In addition, there is an independent concern

---

[13]     The letter had a footnote stating: "This is even more so the case since most faculty are unpaid volunteers, providing educational support on their own time without compensation."

[14]     The letter had a footnote stating: "Such technology is also not compatible with The Queen's Medical Center's electronic medical records system."

[15]     The letter had a footnote stating: "Medical records are presented to a Pathology resident on an ongoing and steady basis. Thus, any reader would need to be present with the resident on an ongoing and steady basis."

Ms. Emily Mauga
March 8, 2019
Page 19

with patient privacy/HIPAA in allowing such third party to access and read patient records, as well as the insurability of such reader from a malpractice standpoint.

In any event, with regard to either the text-to-voice technology or the human reader, such accommodation would impermissibly excuse you from the essential function of reading data and medical information, would be very time-consuming (*e.g.*, it takes much longer to have each number in a large chart read aloud than to visually process it at a glance),[16] and would be ineffective (*e.g.*, hearing aloud and trying to mentally retain a string of numbers does not provide for reliable processing in the same way that visually scanning the numbers would).

The letter also addressed other accommodations that were not feasible.[17]

Regarding Complainant's poor AUC Medical School record as an alternative basis for prospective dismissal, the letter stated that, had this poor record been known at the time of application, it would have prevented him from being admitted.

In December 2017, there were various communications between Respondents' counsel and Complainant's counsel involving Complainant filing a second grievance (*i.e.*, a grievance pertaining to the alternative basis for dismissal); the consolidation of Complainant's two

---

[16]   The letter had a footnote stating: "Pathology residents can be subject to time constraints, such as in responding to particular time-sensitive consultation inquiries and in abiding by duty hours limits."

[17]   The letter stated: "Given the infeasibility of either of the above-mentioned accommodations, you are not qualified for the Pathology resident position, even if certain other accommodations could be provided (*e.g.*, additional time on exams). It is also noted that other proposed accommodations also have challenges. For instance, the Program cannot provide you with training in only anatomic pathology (without clinical pathology) and graduate you on that basis, as the Program is fundamentally designed and approved by the ACGME for both clinical and anatomic study. Allowing recording of lectures, reviews, *etc.* poses challenges with regard to HIPAA privacy issues and the chilling effect that the recordings would have on the robustness of discussions; in any event, even if the recordings could be allowed, that would not resolve the fundamental issues associated with accurately reading and notating data. In addition, the Program cannot create and provide you with a "trial" period to evaluate your safe performance. Such a trial period would have to be of meaningful and substantial duration and clinical breadth and would involve the same type of regular double-checking that, as discussed above, is unreasonable and poses an undue hardship. Even in the PGY-1 curriculum, for many procedures it is essential for a resident to move to indirect supervision which happens after a demonstration of competency; however, in your circumstances, patient safety would still require ongoing regular double-checking to ensure no mis-transpositions, etc."

Ms. Emily Mauga
March 8, 2019
Page 20

grievances; the setting of a grievance hearing date for January 19, 2018; the rescheduling of the grievance hearing date to January 30, 2018 specifically to accommodate the schedule of Complainant's counsel; the identification of the three Hearing Committee Members (all of them JABSOM Program Directors outside the Pathology Program); Complainant's request for a wide array of documents for his review prior to the grievance hearing; the Program's response that there was no requirement for the Program to provide all the requested documents but nevertheless some documents had already and would still be given, and also that Complainant could still access his UH on-line account; and Complainant's submission of documents for the hearing, which were then provided to the Hearing Committee members.

On January 24, 2018 – less than one week before the hearing – Complainant's counsel sent a letter to Respondents' counsel, demanding that personnel documents be provided, that Dr. Powers be completely removed from any decision-making, and that the Hearing Committee be denied access to its own its own independent legal counsel (who is separate from UH's and HRP's counsel). Complainant's counsel further asserted that, unless Complainant's demands were met, Complainant would not attend the grievance hearing.

On January 29, 2018, Defendants' counsel sent a letter to Plaintiffs' counsel, carefully explaining why each of Plaintiff's demands lacked merit and indicating that Plaintiff remained welcome to attend and provide his explanation to the Hearing Committee.

On January 30, 2018, the hearing was conducted, and Dr. Powers explained the Program's position to the three-member Hearing Committee. Complainant and his counsel remained invited but chose not to attend the hearing. Thereafter, the Hearing Committee privately deliberated with its own counsel, and neither HRP nor UH was involved in that deliberation.

On January 31, 2018, the Hearing Committee notified Dr. Powers that the Committee unanimously recommended that the Program proceed with dismissal.

On February 1, 2018, Dr. Powers sent a letter to Plaintiff, notifying him that the Hearing Committee had unanimously recommended that the Program proceed with dismissal and that, in her academic discretion, Dr. Powers had accepted the Hearing Committee's recommendation.

## II.   ANALYSIS

Respondent HRP is not liable for the reasons below. Respondent UH was Complainant's academic institution, not his employer, and for that reason alone cannot be liable under the ADA. However, assuming *arguendo* that UH could be deemed to be Complainant's employer (which in fact is not the case), it would still not be liable for the reasons below.

Ms. Emily Mauga
March 8, 2019
Page 21

### A.     Complainant Might Not Have a Disability

Complainant might not have a disability.  As stated in Dr. Tyson's January 2017 evaluation, Complainant tested average or superior in every category, including the five reading-related categories:  Vocabulary, Comprehension, Reading Rate, and Total Reading.  As Dr. Tyson herself repeatedly states, Complainant's aptitude in reading is deemed a deficiency only when compared to the expected reading level of persons with high cognitive abilities.  Under this analysis, Complainant is not substantially limited in a major life activity compared to the average person.

### B.     Even if Complainant Has a Disability, He Was Not Qualified For His Residency Position and Therefore Could Be Lawfully Dismissed

Even assuming Complainant had a disability, he was still not a qualified individual because he was unable to perform the essential functions of his PGY-2 resident position, and there was no reasonable accommodation that would enable him to do so.  Therefore, Complainant could be lawfully dismissed.

The Ninth Circuit has made it clear that great deference should be afforded to an educational institution's academic determinations, including its determinations as to whether particular accommodations are reasonable.

> [A] majority of circuits have extended judicial deference to an educational institution's academic decisions in ADA and Rehabilitation Act cases.  [Citations omitted.]  These courts noted the limited ability of courts, "as contrasted to that of experienced educational administrators and professionals," to determine whether a student "would meet reasonable standards for academic and professional achievement established by a university," and have concluded that "courts are particularly ill-equipped to evaluate academic performance."  [Citation omitted.]

> We agree with the First, Second and Fifth circuits that an educational institution's academic decisions are entitled to deference.  Thus, while we recognize that the ultimate determination of whether an individual is otherwise qualified must be made by the court, we will extend judicial deference "to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons."  [Citation omitted.]

> Deference is also appropriately accorded an educational institution's determination that a reasonable accommodation is not available.  Therefore, we agree with the First Circuit that "a court's duty is to first find the basic facts, giving due deference to the school, and then to evaluate whether those facts add up to a professional, academic judgment that reasonable accommodation is not available."  [Citations omitted.]

Ms. Emily Mauga
March 8, 2019
Page 22

*Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1047-48 (9th Cir 1999) (deferring to university's determinations that medical student was academically deficient and that her requested accommodations were not reasonable).

In this instance, deference should be given to the Program's determinations that Complainant was academically deficient and that the accommodations he needed to effectively perform his functions were not reasonable.

First, it is undisputed that Complainant could not meet essential functions. Throughout his PGY-2 year, despite ongoing feedback and 1-on-1 mentoring, he had serious problems including making incorrect diagnoses and interpretations, and giving incorrect advice to clinicians. This meant that he was not demonstrating increasing facility in Core Competencies (such as Patient Care and Medical Knowledge) and could not function with only Indirect Supervision. In fact, Dr. Tyson expressly stated that Complainant needed individual supervision and to have work regularly double-checked which effectively meant having faculty alongside and monitoring him throughout his duties.

Second, although the Program was willing to provide some of the requested accommodations (*e.g.*, additional time on exams, constructive feedback), the Program reasonably determined that the most critical accommodations were not reasonable (and/or posed an undue hardship). For instance:

- Double-checking work
  As a matter of patient safety, given Complainant's heightened risk for making errors, sporadic spot-checking would be insufficient; there had to be regular double-checking. Yet regular double-checking (a) would require faculty (most of them uncompensated volunteers) to regularly repeat/review Complainant's measurements, which they would not have time to do; (b) would duplicate Complainant's duties and excuse him from essential functions; and (c) would have to continue for an open-ended period of time, which would exacerbate the already significant hardship.

- Text-to-voice technology or a human reader
  As to text-to-voice technology: Much of the paperwork that a pathology resident (and pathologist) must review involves significant quantities of numbers in table and chart form. As Dr. Tyson acknowledged, text-to-voice technology is simply not compatible for this type of paperwork.

  As to a human reader: Since the paperwork arises on an ongoing and steady basis, a human reader would need to be present on an ongoing and steady basis. However, the Program was not financially able to employ such a reader on that basis. In addition, there would be issues as to patient privacy/HIPAA in having a third party access and read medical records, as well as the insurability of such an individual.

Ms. Emily Mauga
March 8, 2019
Page 23

In any event, with regard to either the text-to-voice technology or the human reader, such accommodation would impermissibly excuse Complainant from the essential function of reading data and medical information, but rather would be very time-consuming (*e.g.,* it takes much longer to have each number in a large chart read aloud than to visually process it at a glance, and Pathology residents can be subject to time constraints, such as in responding to time-sensitive consultation inquiries and in abiding by duty hours limits), and would be ineffective (*e.g.,* hearing aloud and trying to mentally retain a string of numbers does not provide for reliable processing in the same way that visually scanning the numbers would).

In sum, the accommodations that Complainant needed to perform essential functions were not reasonable and/or posed an undue hardship, and therefore he was not a qualified individual.

Third, there is also the possibility that Complainant's inability to perform his duties was due not to any medical impairment, but rather simply to a lack of aptitude for pathology work. In that case, there would be no medical limitation to accommodate, and he would still not be a qualified individual. For instance, among his repeated diagnostic errors, when Complainant misidentified a patient's stomach biopsy as being from the colon, this could have simply reflected Complainant's deficient knowledge and analysis. (Alternatively, this could have been due to Complainant mis-transposing accession numbers and inputting one patient's diagnosis into another patient's accession file.)

Finally, in his Charge, Complainant alleges:

After meeting with Dr. Tyson, Dr. Powers had already prejudged me as not worthy of continuing with my employment in the Program, which is evidenced by her statement that my Employer "was willing to consider" my diagnosis of dyslexia, but that my Employer "does not find or state that your condition constitutes a disability."

There is nothing nefarious about Dr. Powers' comment.[18] The comment merely reflected the fact that it was not clear that Complainant had a disability – a fact supported by Dr. Tyson's own findings that Complainant was at least average (if not superior) in all cognitive abilities. Furthermore, Dr. Powers' comment went on to indicate that accommodations would still be considered, meaning that the Program was nevertheless engaging in the process that Complainant was seeking.

_____

[18]    The actual comment is: "The Program does not find or state that your condition constitutes a disability but nevertheless has proceeded with considering potential accommodations."

Ms. Emily Mauga
March 8, 2019
Page 24

      **C.**    <u>**Alternatively, Complainant's Dismissal Was Lawful Due to his AUC Medical School Record**</u>

      Even if an individual belongs to a protected class, he or she can still be subject to adverse employment action for independent reasons. In this case, the independent reason was Complainant's poor AUC Medical School record, including that he was unable to pass <u>pathology</u> coursework <u>in three attempts</u> and that he was outright <u>dismissed</u>. Complainant did not disclose this record during his 2014 application to the Pathology Program; for instance, in his written ERAS application, although he affirmatively gave an explanation for his "transfer" from AUC, he made no mention of dismissal which would be a significant, if not sole, reason for the "transfer." Therefore, the Program was unaware of this poor record until 2017. Had the Program initially been aware of the record, Complainant would not have been accepted into the Program.

**III.**    <u>**CONCLUSION**</u>

      For the foregoing reasons, Respondent respectfully requests that the Charge be dismissed with a "no cause" finding. Please contact me if additional information is needed.

      Thank you for your attention to this matter.

                 Very truly yours,

                 Christopher S. Yeh

CSY/kln