IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| GUARAV THAKRAL, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>HAWAIʻI RESIDENCY PROGRAMS,[1] INC., DAVID LASSNER, in his official capacity as President of the University of Hawaiʻi, AND UNIVERSITY OF HAWAIʻI,<br><br>Defendants. | Case No. 19-cv-00563-DKW-RT<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Before the Court is a motion for summary judgment, filed on behalf of

Defendants David Lassner and the University of Hawaiʻi ("UH" and, collectively

with Lassner, "Defendants"). Defendants argue Plaintiff Guarav Thakral's

disability discrimination, failure to accommodate, and retaliation claims are

untimely. Defendants also assert that Thakral fails to state a disability

discrimination claim because he cannot rebut the legitimate nondiscriminatory

reasons—*i.e.*, inadequate performance and non-disclosure of his previous dismissal

---

[1]While Hawaiʻi Residency Programs, Inc. still appears in the case caption, the Court dismissed all claims against that entity on March 9, 2020. Dkt. No. 23 at 12–18.

from medical school—for his dismissal from UH's Pathology Residency Program (the "Residency Program").

Thakral argues his claims were timely brought and that genuine factual questions remain as to why he was dismissed from the Residency Program. For the reasons articulated below, the Court agrees with Thakral, and Defendants' motion for summary judgment is DENIED.

## RELEVANT BACKGROUND

The University of Hawaiʻi John A. Burns School of Medicine has a four-year Pathology Residency Program. Dkt. No. 50 at ¶ 1. Thakral was enrolled as a first-year Pathology Resident for the 2015–2016 academic year. Dkt. No. 1 at ¶ 33. In July 2016, Thakral progressed to the second-year of his Pathology Residency. Dkt. No. 1 at ¶ 34. At that time, he was ordered to participate in Targeted Mentorship due to concerns over his "substandard" performance on a medical knowledge exam and his "overall knowledge base." Dkt. No. 50-11. As part of Targeted Mentorship, Thakral had 1-on-1 meetings with two assigned mentors on an approximately weekly basis. Dkt. No. 50-5 at 33–34, 39–41.

In October 2016, Thakral completed a cytopathology rotation. Dkt. No. 50-12. In a post-rotation performance report, Thakral's rotation supervisor observed that, though Thakral displayed great teamwork and effort, he "need[ed] to improve his overall efficiency and organization," "seemed not to be able to retain"

cytodiagnostic knowledge despite "concerted efforts," and needed to improve his "fund of medical knowledge" to further develop his "cytodiagnostic skills." *Id.* In a rubric ranging from one to five, Thakral's supervisor gave Thakral scores mostly in the lowest one to two range for various categories and a two for overall performance. *Id.*

Also in October 2016, at around the same time Thakral completed his cytopathology rotation, he was placed on "Academic Notice" due to ongoing concerns about, among other things, his "continuous challenges and deficiencies in the competency of medical knowledge." Dkt. No. 50-14. Thakral was, thus, required to participate in "remediation," including "additional opportunities to improve . . . surgical pathology skills and knowledge base." *Id.* One such opportunity was a two-month (November and December 2016) rotation, during which progress reports would be generated, the Program Director, Dr. Amy Powers, would meet with Thakral to discuss his progress, and he would be tested. *Id.* He was also assigned two additional mentors. *Id.*; *see also* Dkt. No. 50-5 at 54–55.

In January and February of 2017, Thakral completed a blood transfusion (aka blood bank) rotation. Dkt. No. 50-6 at 93–97. During that rotation, he had significant 1-on-1 mentoring from the two rotation supervisors. *Id.* Despite these efforts, on February 2, 2017, Thakral was placed on "Academic Warning" due to

"concerns about [his] medical knowledge and patient care competencies." Dkt. No. 50-15. The Residency Program set out goals for Thakral to meet by the end of February, at which time his blood bank rotation would end. *Id.* Among those was that he achieve a 3 out of 5 in his end-of-rotation evaluation and that he be able "to function at an indirect level of supervision when consulting with laboratory staff and clinical colleagues for routine blood bank and coagulation consults." *Id.* Thakral was to have daily mentoring/review sessions with various mentors to facilitate his improvement. *Id.* The warning made clear that failure to improve could lead to "Academic Probation, non-renewal of appointment agreement[,] or dismissal." *Id.*

At the conclusion of his blood bank rotation, Thakral received a one out of five for his overall performance, the lowest rating on the rubric. Dkt. No. 50-16 at 19. His rotation supervisor observed that Thakral "[h]ad difficulty putting together consultations and coming to the correct diagnosis," "[c]ould not accurately interpret abnormal LAC testing results or coagulation factor inhibitors [despite] multiple reviews of the subject and testing algorithms," "had difficulty retaining concepts even though they were discussed in multiple occasions," "[d]oes not recognize the limits of his own knowledge," which resulted in giving incorrect advice to a clinician on at least one occasion, and "continues to have significant

medical knowledge deficits in both transfusion medicine and coagulation." *Id.* at 3–19.

After roughly two weeks in a General Anatomic Pathology rotation—another rotation in which Thakral's performance was apparently in need of improvement, *see* Dkt. No. 50-17—Thakral was notified of his prospective dismissal from the Residency Program, Dkt. No. 50-18 (Notice of Prospective Dismissal dated March 17, 2017). Thakral's dismissal was recommended by a Clinical Competency Committee and accepted by the Program Director, Dr. Powers. *Id.* As the reason for dismissal, the notice letter details Thakral's ongoing performance issues and states that "careful consideration was given to the Program's extensive remediation efforts and [his] prior and ongoing deficiencies (such as marginal performance in cytopathology with deficits in medical knowledge and knowledge retention, failure to pass the Blood Bank rotation, and the impact of the deficiencies on patient safety)." *Id.* While the notice placed Thakral on leave, it did not establish a fixed date of dismissal. *See id.* Rather, it stated that his dismissal would become effective in fourteen days if he failed to file a grievance challenging it. *Id.*

On January 11, 2017, prior to the issuance of the Notice of Prospective Dismissal, Thakral received a report from a neuropsychologist, Dr. Karen Tyson

("Tyson Report").[2]  Dkt. No. 53-3.  The Tyson Report diagnosed Thakral with

dyslexia and anxiety and stressors caused by high academic and professional

demands.  *Id.* at 22.  The Tyson Report recommends UH put in place a host of

accommodations to help address this diagnosis: (1) additional testing time; (2)

advisor and peers reviewing Thakral's work for accuracy; (3) targeted mentorship;

(4) remediation, feedback, and intensive faculty support; (5) 1-on-1 faculty

teaching session; (6) provision of qualified readers, as necessary; and (7) written

and verbal feedback.  *Id.* at 24.  However, the report concluded by stating that

"[s]hould Dr. Thakral continue to exhibit difficulties in his progression of the

Pathology Residency with the aforementioned accommodations, significant

consideration should be placed in reassignment to an alternative residency

program."  *Id.*

When Thakral made the Program aware of his dyslexia diagnosis and the

Tyson Report is disputed.  Thakral avers he made the program aware of his

diagnosis shortly after receiving the Tyson Report in January 2017, roughly two

months before he received his first Notice of Prospective Dismissal.  Dkt. No. 50-

5 at 103–107 (stating he tried to show Dr. Powers and another UH-affiliated doctor

a copy of the report on his phone at a January 2017 meeting).  He alleges that, at

---

[2]Both parties refer to a report by Dr. Tyson that was initially issued on January 11, 2017 but that was later amended on May 31, 2017.  Dkt. Nos. 50-20, 53-3.  The original, unamended report does not appear in the current record.

that time, Dr. Powers refused to review the Report. *Id.* at 105. Dr. Powers, for her part, says the first time she was made aware of Thakral's dyslexia diagnosis was at the March 17, 2017 meeting where she delivered to Thakral his first Notice of Prospective Dismissal. Dkt. No. 50-2 at ¶ 12; *see also* Dkt. No. 50-19.

On March 31, 2017, Thakral filed a grievance challenging the Program's Notice of Prospective Dismissal. Dkt. No. 50-13. In it, Thakral argues that while he is capable of excelling as a Pathology Resident, his then undiagnosed and insufficiently accommodated dyslexia prevented him from doing so. *E.g.*, *id.* at 3 ("my learning disability and its consequent effects, has substantially impacted my ability to be successful without some accommodations"). He requested "reasonable accommodations" and invited the program to "engage with [him] in an interactive process to allow [him] to continue" in the Program. *Id.*

Dr. Powers requested additional information on Thakral's requested accommodations on April 24, 2017. Dkt. No. 50-19; *see also* Dkt. No. 53-3 (letter from Dr. Powers to Thakral explaining which requested accommodations could be provided, which could not, and asking for more information as to others). In response, on August 5, 2017, Dr. Tyson sent a letter to Dr. Powers clarifying Thakral's diagnosis and requested accommodations. Dkt. No. 53-6. She concluded the letter by stating, "I am confident that with these accommodations in his workplace, [Thakral] should be successful in providing excellent care to the

citizens of Hawai'i." *Id.* at 3. Dr. Szuster, who is a counseling resource affiliated

with UH and who counseled Thakral, also provided a letter clarifying his diagnoses

and recommendations concerning accommodations, which did not materially differ

from those of Dr. Tyson. *See* Dkt. No. 53-4.

Meanwhile, UH became aware that Thakral had been dismissed from one

medical school before enrolling in and graduating from another. Dkt. No. 50-2 at

¶¶ 13–14 (Dr. Powers alleging she first learned of this fact after reading Dr.

Tyson's amended report). Thakral challenges this allegation; he avers he made

the Program aware of his prior dismissal when interviewing for the Residency

Program. Dkt. No. 53-2 at ¶ 10. Nonetheless, on November 21, 2017, the

Program issued Thakral a "Follow-up on Notice of Prospective Dismissal"

("Second Notice"). Dkt. No. 50-21. In the Second Notice, the Program explains

that some of Thakral's requested accommodations "are not reasonable and/or

would pose an undue hardship (including fundamental alteration) on the Program

and therefore cannot be provided." *Id.* at 1–2. Specifically, double-checking all

of Thakral's work and providing text-to voice technology, particularly for medical

records, could not be reasonably provided. *Id.* The Second Notice also explained

that Thakral's previously undisclosed dismissal from a medical school serves as a

second reason warranting dismissal from the Program. *Id.* at 4–5. The Second

Notice, like the first one in March 2017, did not establish a date of dismissal,

stating only that dismissal would be effective in fourteen days if Thakral failed to file a grievance. *Id.* at 5. Thakral asserted a second grievance as to this second ground for dismissal on December 5, 2017. Dkt. No. 53-7.

After a January 30, 2018 hearing on Thakral's grievances—which neither Thakral, nor his attorney attended—the three-person hearing panel unanimously decided to proceed with Thakral's dismissal. Dkt. No. 50-23. On February 1, 2018, Dr. Powers issued a letter to Thakral effectively dismissing him from the Program as of that date. Dkt. No. 50-24. On November 28, 2018, Thakral filed a charge with the Equal Employment Opportunity Commission ("EEOC"). Dkt. No. 50-25. On July 12, 2019, the EEOC issued Thakral a Notice of Right to Sue Within 90 Days. Dkt. No. 1 at ¶ 25. That letter was received by Thakral on July 22, 2019. *Id.* at ¶ 27. He commenced this suit on October 18, 2019. *Id.*

On April 14, 2021, Defendants Lassner and UH filed a motion for summary judgment. Dkt. Nos. 49, 50. Collectively, they argue that because UH was not Thakral's employer, they cannot be held liable for any adverse employment decisions. Defendants also assert Thakral failed to timely file a charge with the EEOC and fails to state a prima facie disability discrimination claim. *Id.* Thakral filed a response on May 28, 2021, Dkt. No. 53, to which Defendants replied on June 4, 2021, Dkt. No. 56. This order follows.

# LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In evaluating a motion for summary judgment, the Court construes all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Thus, the moving party bears the burden of persuading the court as to the absence of a genuine dispute of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must set forth "significant probative evidence" demonstrating such a genuine dispute exists. *T.W. Elec. Serv.*, 809 F.2d at 630 (citation and internal quotation marks omitted). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion," and can do so by either "citing to particular parts of materials in the record" or by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

Defendants make three primary arguments. First, they assert that they were not Thakral's employer and therefore cannot be liable under the Americans with Disabilities Act ("ADA") for adverse employment decisions. Dkt. No. 49-1 at 15. Second, they argue Thakral's claims are untimely because he failed to file an EEOC charge within 300 days after he was notified of his dismissal from the Residency Program, the Program denied his accommodations request, or his contract terminated. *Id.* at 16–20, 24. Third, Defendants argue that Thakral fails to state a prima facie claim of employment discrimination because he fails to present evidence that (1) he was qualified for the Pathology Resident position or (2) his disability was the but-for cause of his dismissal. *Id.* at 20–23.

Due to UH's apparent control over Thakral's work—explicit in his employment contract with Hawaiʻi Residency Programs, Inc. ("HRP"), *see* Dkt. No. 50-10, and implicit from the record—the Court finds that whether UH could be considered Thakral's "employer" for ADA purposes is, at a minimum, a genuine question of fact. As to timeliness, the Court finds that the 300-day statute of limitations clock started on February 1, 2018—when UH first made explicit

Thakral's dismissal, *see* Dkt. No. 50-24—and not on either March 17, 2017 or

November 21, 2017—when UH issued Thakral Notices of *Prospective* Dismissal,

Dkt. Nos. 50-18, 50-21.   Accordingly, his November 28, 2018 EEOC charges, *see*

Dkt. No. 50-25, were timely.

As to presenting a prima facie case, there is at least some competing

evidence as to whether, if provided reasonable accommodations, Thakral could be

qualified for and succeed in the residency position.[3]   Regarding causation, the

Court cannot find at this stage of the litigation that his performance, rather than his

insufficiently accommodated disability, was the cause of his dismissal.   As to the

second ground for dismissal, Thakral having been dismissed by a prior medical

school, Thakral has at least raised the specter of this reason being pretextual.

Thakral represents that he alerted two UH-affiliated doctors to his prior dismissal

from medical school during the Residency Program interview process.   Dkt. No.

---

[3]Though there is competing evidence, that evidence is far from equal. Thakral appears to have a significant record of inadequate performance as a Pathology Resident, with some of that performance occurring *after* UH employed some of the very accommodations Thakral's doctor prescribed.   *See* Dkt. Nos. 50-11, 50-12, 50-15, 50-16, 50-17, 50-18 (various doctors cataloguing gaps in knowledge and skill in various rotations both before and after UH made several attempts at remediation and mentorship).   Whether Dr. Tyson's opinion that with appropriate "accommodations in his workplace, [Thakral] *should* be successful" in his role, Dkt. No. 53-6 at 3 (emphasis added), is sufficient to overcome this record is questionable.   This same observation applies to Thakral's ability to show his disability was the but-for cause of his dismissal.   Other than temporal proximity—that is, Thakral allegedly told UH of his disability roughly two months before receiving a Notice of Prospective Dismissal—evidence that UH dismissed him *because of* his disability is sparse.   Nonetheless, it is not the Court's role to weigh the evidence or to determine credibility at the summary judgement stage.

53-2 at ¶ 10 (Thakral declaration). That he was nonetheless admitted to the Program calls into question the significance of this fact to his dismissal.

Because questions of fact remain as to whether UH was Thakral's employer for ADA purposes, whether Thakral was qualified for the position of Pathology Resident, and whether Thakral's disability was the cause of his dismissal from the Residency Program, summary judgment is not appropriate. Accordingly, Defendants' motion is DENIED.

## I.    Thakral's Employer

Whether an employment relationship exists for purposes of ADA liability depends primarily on the degree of *control* an organization or person has over another individual's work. *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448–450 (2003). Whether the requisite degree of control exists is determined by considering a number of factors, including, but not limited to:

> (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party.

*Jass v. CherryRoad Techs., Inc.*, 449 F. Supp. 3d 923, 938 (D. Haw. 2020) (citing

*Clackamas*, 538 U.S. at 638 n.5).

13

Defendants argue that, because Thakral's employment agreement was with HRP, and HRP provided Thakral's salary and benefits, HRP and not UH was Thakral's employer. Dkt. No. 49-1 at 15. While formal agreements between parties and who provides compensation are two factors the Court may consider in determining whether an employment relationship exists, they are not the only factors. Here, it is clear that, despite Thakral's contract being with HRP and HRP providing Thakral's compensation, UH had significant control over Thakral's work. Accordingly, without deciding the question of whether UH was, in fact, Thakral's employer, such that it is subject to ADA liability, there are sufficient factual allegations and evidence in the record for a reasonable juror to find just that.

It is undisputed that UH "controlled" where Thakral worked and, on occasion, gave him additional work assignments. *See* Dkt. No. 50-14 (the Program explaining they made "changes to [Thakral's] 2016-17 rotation schedule to provide [him] with additional opportunities"). Further, not only did UH have the power to unilaterally terminate Thakral's position, it, in fact, exercised that power. *See* Dkt. No. 50-18. On March 17, 2017, UH issued a letter to Thakral immediately placing him on leave, pending final determination of dismissal. *Id.* UH even dictated the payment terms associated with that leave—with the first fourteen days paid; the remainder (pending resolution of any grievance) unpaid.

*Id.* This notice was signed only by Dr. Powers, the Director of the Program, and not by any representative from HRP. *Id.* Clearly, UH had much to say about Thakral's work.

Thakral's contract with HRP, by its terms, also demonstrates that UH had considerable control over Thakral's employment. *See* Dkt. No. 50-10. The contract states that "HRP is not responsible for day-to-day supervision of the Resident's academic and patient care (clinical) work, and this work will be overseen by" the Program Director and Clinical Faculty at UH and the various hospitals at which the resident may work. *Id.* at ¶ 2(a). Thakral was required to abide by all HRP *as well as* UH policies. *E.g.*, *id.* at ¶¶ 2(a), 3(a), 3(b). The Program Director, "in his/her sole academic discretion, may impose sanctions upon the Resident" up to and including "notice, warning, probation, suspension (including loss of compensation and requirement to make up the time for the period of suspension), non-appointment to a subsequent Resident Agreement, non-award of academic credit, and/or permanent dismissal." *Id.* at ¶ 8. Again, this provides clear evidence that UH had significant control over Thakral's work, perhaps even more so than HRP, the contracting party.

Based on the record before it and viewing the evidence in the light most favorable to Thakral, the Court finds that, at a minimum, whether UH was

Thakral's employer for purposes of ADA liability is a genuine question of material fact and, thus, not ripe for resolution at summary judgment.

## II. <u>Statute of Limitations</u>

The parties dispute when the statute of limitations started to run on Thakral's claims.[4]   Defendants argue that the statute of limitations started to run on March 17, 2017, when Dr. Powers delivered to Thakral the First Notice of Prospective Dismissal from the program or on November 21, 2017, when Thakral received his Second Notice of Prospective Dismissal, which included an explanation of why certain requested accommodations could not be provided.   Dkt. No. 49-1 at 16–20. Thakral argues the statute of limitations began to run on February 1, 2018, when he was definitively dismissed, effective immediately.   Dkt. No. 53 at 8–18.   The Court agrees with Thakral.

The parties primarily rely on the same case to support their positions: *Delaware State College v. Ricks*, 449 U.S. 250 (1980).   As relevant here, in *Ricks*, the plaintiff, a college professor, alleged he was denied tenure in violation of Title VII.   *Id.* at 254–258.   After a tenure committee twice recommended that Ricks' tenure be denied, the Faculty Senate voted to adopt the committee's

---

[4]Though Thakral does not expressly address (nor dispute) it, *see generally* Dkt. No. 53, the parties appear to agree that, regardless of when the statute of limitations clock started, Thakral had 300 days from that point in which to file a charge of discrimination with the EEOC.   *See* Dkt. No. 49-1 at 17; *see also* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e).

recommendation, and the College Board of Trustees formally voted to deny him tenure, Ricks was offered and accepted a terminal, one-year contract. *Id.* Such terminal contracts were standard practice for professors denied tenure at Delaware State College ("Delaware State"), principally to enable them to locate another job while still employed. *Id.* at 252–53. At the conclusion of the contract, the plaintiff's employment with Delaware State would cease. *Id.*

At issue was when the alleged discriminatory act occurred; that is, whether it occurred when Ricks was denied tenure or when his employment with Delaware State formally ceased. *See id.* at 257 ("Determining the timeliness of Ricks' EEOC complaint, and this ensuing lawsuit, requires us to identify precisely the 'unlawful employment practice' of which he complains."). The Court held that because his terminal contract was not the alleged discriminatory act—he was, after all, treated as any other unsuccessful tenure aspirant—it was the date upon which Delaware State communicated its tenure denial to him and informed him of his definite date of dismissal (*i.e.*, at the end of the terminal contract). *Id.* at 257–262.

The case at hand differs from *Ricks* in several significant ways. First, Ricks' actual dismissal was not the allegedly unlawful discriminatory conduct; rather, it was the College's decision to deny him tenure a year before his dismissal. Here, Thakral's *dismissal* is at issue. Second, the will of the Residency Program was not nearly as clearly communicated to Thakral as Delaware State's was to

Ricks. Finally, Ricks was provided with a definite date of dismissal (*i.e.*, at the conclusion of his terminal contract). Here, Thakral had no indication of when (or even if) his dismissal would become effective until February 2018.

In *Ricks*, the Supreme Court explained that Delaware State's denial of tenure was the allegedly unlawful discriminatory conduct at issue. 449 U.S. 257–58. Ricks' eventual severance with the College, in other words, was not at issue; rather, an earlier decision to deny him tenure was the gravamen of his complaint. *See id.* The statute of limitations to file an EEOC charge thus started to run after the College informed Ricks of its *tenure decision*. *Id.* at 261–62. Here, Thakral's *dismissal* from the Program and the Program's failure to adequately accommodate his disability are the gravamen of his complaint. Thakral was not *dismissed* from the program prior to February 1, 2018. *See* Dkt. Nos. 50-18, 50-21 (Notices of Prospective Dismissal).

This is evident through the Program's actions upon issuing its First Notice of Prospective Dismissal. That notice did not terminate Thakral. Instead, it indicated that the Program's decision had not yet been finalized and was subject to any grievance filed by Thakral. In fact, after issuance of the First Notice of Prospective Dismissal, Dr. Powers sought out additional information about Thakral's disability and requested accommodations. Dkt. Nos. 50-19 (an April 2017 letter from Dr. Powers to Thakral). At a minimum, this type of engagement

from Dr. Powers calls into considerable doubt the *intent of the Program* to actually dismiss Thakral.   *Compare Ricks*, 449 U.S. at 262 (explaining that because the tenure committee had twice recommended denying tenure, the Faculty Senate and Board of Trustees had voted to deny tenure, and Ricks was offered and accepted a terminal contract, the district court was "justified in concluding that the College had established its official position—and made that position apparent to Ricks").[5] In other words, based on the language of the notice and Dr. Powers' conduct thereafter, Thakral's fate insofar as the Program was concerned had not yet been firmly decided.

Such a conclusion is further supported by the fact that Thakral was not provided a date of dismissal until February 1, 2018.   *See* Dkt. Nos. 50-18, 50-21. In *Ricks*, after Delaware State communicated its tenure decision, it offered—and Ricks accepted—a one-year terminal contract to end on June 30, 1975.   449 U.S. at 253–54, 259.   Not until Thakral was actually dismissed from the program on February 1, 2018 was he notified of that fact or provided a definite date of dismissal akin to Ricks.   *See* Dkt. No. 50-24 (Dismissal Letter).   In short, the Court finds that until February 1, 2018, it was at least reasonable for Thakral to

---

[5]In *Ricks*, the Court explained that the existence of grievance procedure "does not suggest that the earlier decision [to deny Ricks tenure] was in any way tentative."  449 U.S. at 261.   This was so because the decision to deny Ricks tenure was definitively made and clearly communicated to him.   *Id.* at 261–62   That is not the case here because Thakral was notified only of *prospective* dismissal and the Program's engagement with him after issuing its notice called into question whether its dismissal decision was, in fact, tentative.

believe his dismissal had not been decided.   Using February 1, 2018 as the trigger for the 300-day EEOC limitations period, Thakral's charge was timely.

## III.   <u>Title I ADA Claim — Employment Discrimination</u>

Title I of the ADA makes it unlawful for any covered entity to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   A plaintiff establishes a prima facie ADA employment discrimination claim by showing: (1) he is disabled within the meaning of the statute; (2) he is a qualified individual (that is, able to perform the essential functions of the job); and (3) he suffered an adverse employment action because of his disability.   *See, e.g.*, *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001) (citations omitted).

Only the second two elements are in dispute.   Defendants argue Thakral is not a "qualified individual" for two reasons: (1) he was previously dismissed from a medical school; and (2) he lacks the ability to perform the essential functions of a Pathology Resident.   Dkt. No. 49-1 at 20–21.   Thakral rebuts these arguments by claiming that whether he advised UH of his prior medical school dismissal before acceptance into the Residency program, Dkt. No. 53 at 22–23; *see also* Dkt. No. 53-2 at ¶ 10, and whether he could be provided reasonable accommodations that

would enable him to perform the essential functions of a Pathology Resident remain genuine questions of fact, *see* Dkt. No.53 at 21–23; *see also* Dkt. No. 50-13 (averring same in first grievance). Based on the record before the Court, there is at least some evidence to support Thakral's position.

UH takes an absolute position that it has not, nor would it ever, accept into the Pathology Residency Program a person the Program is aware has previously been dismissed from a medical school. Dkt. No 49-1 at 2, 21. This alone, according to Defendants, disqualifies Thakral. *See id.* at 21. But this position is undermined by Thakral's sworn declaration, in which he avers that he advised Drs. Shimizu and Schiller of his prior dismissal from medical school during his interviews prior to acceptance into the Program. Dkt. No. 53-2 at ¶ 10. That Thakral was nonetheless admitted to the Program, *see* Dkt. No. 1 at ¶ 33, at minimum, calls into question the importance of his prior medical school dismissal. Accordingly, a question of fact remains as to whether Thakral's prior medical school dismissal was a bona fide or pretextual reason to dismiss him.

Similarly, whether Thakral, if provided appropriate accommodations, such as those suggested by Drs. Tyson and Szuster, could perform the essential functions of a Pathology Resident remains a genuine question of fact. The record is clear that Thakral's performance as a Pathology Resident was, to put it mildly, subpar. *See, e.g.*, Dkt. Nos. 50-11, 50-12, 50-15, 50-16, 50-17, 50-18. But there

is also evidence that his struggles in the Program were caused or, at minimum, exacerbated by his dyslexia.   Dkt. No. 53-3.   Further, Dr. Tyson's report and follow-up communications provide some (even if not particularly compelling) evidence that, should UH have provided appropriate accommodations, Thakral could have overcome the difficulties created by his disability and adequately performed the essential functions of a Pathology Resident.   *See* Dkt. No. 53-3; Dkt. No. 53-6.   At this point in the litigation—*i.e.*, summary judgment, with all evidence viewed in a light most favorably to Thakral—this evidence is sufficient to create a genuine question of fact as to whether Thakral is (or could be) a "qualified individual" under the ADA.

Because Thakral's past performance as a Pathology Resident is—at least potentially—bound up with his disability, the Court cannot find, based on the record before it, that his disability was not the but-for cause of his dismissal.   In fact, the Program is explicit that his disability—at the very least—supported its decision to dismiss him:

> In sum, the Program has received information that your dyslexia makes you prone to errors and reversals, and the modifications needed to qualify you for the position would be unreasonable and pose undue hardship.   Your prospective dismissal was decided without awareness of these medical circumstances,[6] but such circumstances further demonstrate the lack of qualification for the Pathology resident position.

---

[6]As set forth above, *supra* at 6, the purported absence of awareness by UH prior to March 2017 is, itself, a question of fact.

Dkt. No. 50-21 at 4.   Of course, it may be shown at trial that Thakral's dyslexia does, in fact, disqualify him for the position because the accommodations he needs to perform the essential functions of a Pathology Resident cannot be reasonably provided.   But the Court cannot take the Program's word on the subjects of whether it was aware of Thakral's disability when it made its prospective decision to dismiss him or on whether the requested accommodations are reasonable as definitively resolving those issues, particularly in the face of declarative evidence to the contrary.

In sum, the Court finds that questions of fact remain as to whether Thakral has stated a prima facie claim of disability discrimination and whether Defendants' purported non-discriminatory reasons for dismissing him were pretextual.

## IV.    Title II ADA Claim – Government Programs/Services

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity."   42 U.S.C. § 12132.   The Ninth Circuit has consistently held that this section "applies only to the 'outputs' of a public agency, not to 'inputs' such as employment."   *Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1174 (9th Cir. 1999).   In short, either a plaintiff is claiming employment discrimination under Title I, 42 U.S.C. § 12111, or is claiming discrimination in access to government programs or services under

Title II, 42 U.S.C. § 12132.   In nearly all cases, the same conduct and relationship cannot support a claim for both.[7]   *See Zimmerman*, 170 F.3d at 1174-76.

As discussed above, there is evidence to support a finding that UH employed Thakral.   However, in this unique context (*i.e.*, a public medical school Residency Program), Thakral appears to also be the recipient of academic benefits from a government entity.   *See Sarkissian v. W. Virginia Univ. Bd. of Governors*, 2007 WL 1308978, at *8 (N.D.W. Va. May 3, 2007) (allowing Title II claim for dismissed medical resident to be advanced).

Accordingly, Thakral's Title II claim survives for the same reasons as his Title I claim.   That is, because, in this unique context, the proof required to make out his Title II claim is virtually identical to the proof required to make out his Title I claim.   Under both Titles, Thakral must show he has a disability, is qualified to be a Resident (Title I) or benefit from the Program (Title II), and that he was terminated from (Title I) or denied the benefits of (Title II) the Program because of his disability.   The qualifications to be hired as a Resident and benefit from the Program are virtually the same.   Likewise, it makes no material difference whether Thakral's dismissal from the Program is framed as

---

[7]The parties did not initially brief the propriety of Title II of the ADA as a vehicle for relief in this case.   The Court ordered the parties to brief that issue on June 15, 2021.   Dkt. No. 61. Both parties have done so.   Dkt. Nos. 65, 66.

"employment termination" or "benefit denial." In other words, as a practical matter, the proof to establish both claims appears to be the same.

Thus, the same questions of fact related to Thakral's Title I claims remain as to his Title II claims, precluding summary judgment.

## V. **Title V ADA Claim – Retaliation**

Title V of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

Though not clear in his complaint, *see* Dkt. No. 1 at ¶¶ 108–114, Thakral appears to argue that Defendants retaliated against him by issuing the First Notice of Prospective Dismissal soon after Thakral notified Dr. Powers of his disability and need for accommodations. *See* Dkt. No. 53 at 24 (arguing that "'temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases'" (quoting *Clackamas*, 341 F.3d at 865)). Thakral alleges Defendants continued to retaliate against him by:

> [A]mong other things, prohibit[ing] Dr. Thakral from obtaining documents and personnel records necessary to support his defense throughout the grievance process, refus[ing] to modify the grievance process despite Dr. Thakral's insistence that the grievance procedures violated his rights under

25

> the Constitution of the State of Hawai'i, fail[ing] to appropriately consider Dr. Thakral's disability, and terminat[ing] Dr. Thakral.

Dkt. No. 1 at ¶ 110.   Defendants argue that these alleged "retaliatory" acts are non-cognizable and/or that Defendants' claims pertaining to them are untimely. Dkt. No. 49-1 at 27–29.

Because these alleged retaliatory acts, ending in termination, *could* be seen as a continuing violation, neither of Defendants' arguments are persuasive.   "The continuing violations doctrine extends the accrual of a claim if a continuing system of discrimination violates an individual's rights up to a point in time that falls within the applicable limitations period."   *Douglas v. California Dept. of Youth Authority*, 271 F.3d 812, 822 (9th Cir.2001) (citations and internal quotation marks omitted).   Here, all alleged retaliatory acts relate to Thakral's request for accommodations, denied grievance, and ultimate dismissal.   Accordingly, they *could* show "an organized scheme leading to and including a present violation such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, which gives rise to the cause of action."   *Ostrofsk v. Dep't of Rehabilitation*, 2009 WL 3011578, at *11 (E.D. Cal. Sept. 17, 2009) (citing 6 Fed. Proc., L.Ed. § 11:950) (internal quotation marks omitted).

Accordingly, as with his Title I claim, the Court finds a genuine issue of fact remains as to whether Defendants' alleged acts after Thakral requested accommodations and grieved his prospective dismissal amounted to retaliation.

## VI.   Federal Rule of Civil Procedure 19

Defendants also contend that the case should be dismissed on summary judgment pursuant to Federal Rule of Civil Procedure 19 because "HRP and [the Hawaiʻi Medical Board] are necessary parties [that] cannot be feasibly joined and are indispensable."[8]   Dkt. No. 49-1 at 29.   Defendants explain that they cannot force HRP to enter into an employment contract with Thakral; nor can it require the Hawaiʻi Medical Board to issue Thakral a license to practice, a necessary qualification for serving as a Pathology Resident.   *Id.* at 29–30.   Thus, even if the Court granted Thakral the relief he seeks—reinstatement in the Program—relief would not be "complete."   *See* Fed. R. Civ. P. 19(a)(1)(A).

Thakral seeks the following relief: reinstatement to his position as a second-year medical resident in the Program, reinstatement of eligibility for employment benefits, and expungement of his records of all instances of the illegal dismissal pleaded herein."   Dkt. No. 1 at ¶¶ 98, 107, 113.   He also seeks "damages in the

---

[8]Pursuant to Federal Rule of Civil Procedure 19, a "required party" must be joined if:

   (A)   in that person's absence, the court cannot accord complete relief among existing parties; or

   (B)   that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

      (i)   as a practical matter impair or impede the person's ability to protect the interest; or

      (ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(A)–(B).

amount to be proven at trial, and reimbursement of his reasonable attorneys' fees and costs incurred in bringing this action." *Id.* at ¶ 114; *see also id.* at 99.

Surely UH does not have the statutory authority to license Thakral. *See* H.R.S. §§ 453-3, 453-4 (granting licensing authority exclusively to the Hawai'i Medical Board). Thakral, however, does not pray for such a license. His related prayer is limited to a resident appointment, which would presumably help him qualify him for that license. The presence of the Hawai'i Medical Board, in other words, is not needed to accord the relief Thakral seeks.

As to the contract with HRP, there is no evidence in the record that UH is incapable of reinstating Thakral to the second-year Pathology Resident position from which it alone removed him. HRP is not needed for that purpose. Moreover, given that UH apparently had the authority to unilaterally terminate Thakral's contract with HRP, *see* Dkt. No. 50-10 ¶ 8 (contract); Dkt. No. 50-24 (dismissal letter), it stands to reason that UH is minimizing and perhaps even misstating the control it has over whether HRP enters into such a contract in the first place with persons accepted into the Residency Program. In any event, the Court notes that Thakral is not seeking a new employment contract with HRP, but

only the opportunity to become *eligible* for such a contract through the Residency Program, *see, e.g.*, Dkt. No. 1 at ¶ 98, relief that UH alone is capable of providing.[9]

Based on the record before it, the Court finds that neither the Hawai'i Medical Board nor HRP are required parties, such that dismissal would be warranted pursuant to Rule 19. *See* Fed. R. Civ. P. 19.

## CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment, Dkt. No. 49, is DENIED.

IT IS SO ORDERED.

Dated: June 28, 2021 at Honolulu, Hawai'i.

_____
Derrick K. Watson
United States District Judge

---

*Thakral v. Hawai'i Residency Programs, Inc., et al.*, Civil No. 19-00563-DKW-RT; **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

[9]In addition, Thakral requests monetary damages for UH's alleged discriminatory conduct. As to this relief, no other party is required to effect complete relief as UH actors are the only ones alleged to have engaged in any conduct warranting damages.